JESSICA ANNE MARIE FOUST, #17179507
82911 beach access Rd.
Umatilla OR 97882
Plaintiff, *pro se*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF OREGON

| | |
|---|---|
| JESSICA ANNE MARIE FOUST, | ) |
| Plaintiff, | )Case No. |
| | ) |
| | ) |
| v. | ) AMENDED COMPLAINT |
| | ) |
| The State of Oregon; | ) |
| COLETTE PETERS, Director, Oregon Department of | ) |
| Corrections (ODOC); | ) |
| GARRETT LANEY, Superintendent, Oregon State | ) |
| Correctional Institution (OSCI); | ) |
| JON HYDE; Captain, OSCI; | ) |
| G. ROSS, Captain OSCI; | ) |
| JOSHUA WAGNER, Captain & PREA Compliance | ) |
| Manager, OSCI; | ) |
| BRIAN KELLY, Oregon State Penitentiary (OSP) | ) |
| Superintendent; | ) |
| (FNU) GARFIELD, OSCI Correctional Officer (C/O); | ) |
| JOHN and JANE Does 1-20, ODOC/OSCI/OSP | ) |
| employees whose identities are presently unknown to | ) |
| Plaintiff but who were involved in the violations alleged | ) |
| herein: | ) |
| | ) |
| all sued in their individuals and official capacities. | ) |
| | ) |
| Defendants. | ) |
| | ) VERIFIED COMPLAINT |
| | ) |
| | ) |
| | ) JURY TRIAL DEMANDED |

_____

## JURISDICTION AND VENUE

1.     This action arises under 42 USC § 1983.

2.     This Court has subject matter jurisdiction under 28 USC §§ 1331 and 1343(a)(3).

3 .     This Court has personal jurisdiction over each and every Defendant because they are residents of Oregon who are employed in Oregon and acting under color of state law during all relevant times.

4 .     Venue is proper pursuant to 28 USC § 1391(b)(2) because all Defendants are employed by ODOC, which is headquartered in Salem, Oregon.

## PARTIES

5 .     Plaintiff JESSICA FOUST is a transgender woman with gender dysphoria, who has been in ODOC custody since June 2008. Since that time, Ms. FOUST has been housed in multiple ODOC facilities: Snake River Correctional Institution (SRCI), Two Rivers Correctional Institution (TRCI), Oregon State Penitentiary's segregation unit (OSP), and Oregon State Correctional Institution (OSCI). Ms. FOUST is currently housed at OSCI with an earliest release date of November 30, 2036. Plaintiff meets the criteria of a Vulnerable Inmate as defined by ODOC Policy 40.1.13.

6.     defendant THE STATE OF OREGON, operates the ODOC facilities. The state of Oregon is Obligated to ensure the safety of the Adults in custody (AIC) within its facilities.

7 .     Defendant COLETTE PETERS, is and was at all relevant times, the Director of ODOC. Defendant PETERS exercised final policy and decision-making authority over ODOC and its personnel at all relevant times. Defendant PETERS had a duty to ensure the provision of adequate medical care to prisoners, and to reasonably protect prisoners facing a substantial risk of physical harm, including through the implementation of policies and the training and supervision of ODOC staff. Defendant PETERS is among those responsible for failing to reasonably protect Ms. FOUST from harm; she is suing in her individual and official capacity.

8.     Defendant GARRETT LANEY, is and was at all times relevant, Superintendent, Oregon State Correctional Institution (OSCI), in charge of, *inter alia*, all institutional personal

management practices, including: employee work analysis and performance evaluations, staff mentoring, staff training programs, grievance procedures, disciplinary actions all consistent with Departmental mission and goals. Defendant LANEY had a duty to ensure the provision of adequate medical care to prisoners, and to reasonably protect prisoners facing a substantial risk of physical harm, including through the implementation of policies and the training and supervision of ODOC staff. Defendant LANEY is among those responsible for failing to reasonably protect Ms. FOUST from harm; she is suing in him individual and official capacity.

9.    Defendant JON HYDE, is and was at all times relevant a Captain at OSCI. Defendant HYDE was tasked with the minute day-to-day operations of the evacuation of OSCI inmates to OSP. Defendant HYDE had a duty to ensure the provision of adequate medical care to prisoners, and to reasonably protect prisoners facing a substantial risk of physical harm. Defendant HYDE is among those responsible for failing to reasonably protect Ms. FOUST from harm; she is suing in him individual and official capacity.

10.    Defendant G. ROSS, is and was at all times relevant a Captain at OSCI. Defendant ROSS was tasked with the minute day-to-day operations of the evacuation of OSCI inmates to OSP. Defendant ROSS had a duty to ensure the provision of adequate medical care to prisoners, and to reasonably protect prisoners facing a substantial risk of physical harm. Defendant ROSS is among those responsible for failing to reasonably protect Ms. FOUST from harm; she is suing in him individual and official capacity.

11.    Defendant BRIAN KELLY, was at all times relevant, Oregon State Penitentiary (OSP) Superintendent, in charge of, *inter alia*, all institutional personal management practices, including: employee work analysis and performance evaluations, staff mentoring, staff training programs, grievance procedures, disciplinary actions all consistent with Departmental mission and goals. Defendant KELLY had a duty to ensure the provision of adequate medical care to

prisoners, and to reasonably protect prisoners facing a substantial risk of physical harm, including through the implementation of policies and the training and supervision of ODOC staff. Defendant KELLY is among those responsible for failing to reasonably protect Ms. FOUST from harm; she is suing in him individual and official capacity.

12.    Defendant (FNU) GARFIELD, is and was at all times relevant, an OSCI Correctional Officer (C/O). Defendant GARFIELD was tasked with overseeing and running the day-to-day operations of the dorm at OSP, and had a duty to ensure the provision of adequate safety to prisoners, and to reasonably protect prisoners facing a substantial risk of physical harm. Defendant GARFIELD is among those responsible for failing to reasonably protect Ms. FOUST from harm; she is suing in him individual and official capacity.

13.    Defendant (FNU) THOMAS, was at all times relevant a Behavioral Health Services (BHS) counselor at the OSCI, and had a duty to ensure the provision of adequate medical/mental care to prisoners, and to reasonably protect prisoners facing a substantial risk of physical/emotional harm. Defendant THOMAS is among those responsible for failing to reasonably protect Ms. FOUST from harm; she is suing in him individual and official capacity.

14.    Defendant GATES, was at all times relevant the OSCI BHS Manager, in charge of overseeing all BHS counselors, and had a duty to ensure the provision of adequate medical/mental care to prisoners, and to reasonably protect prisoners facing a substantial risk of physical/emotional harm. Defendant GATES is among those responsible for failing to reasonably protect Ms. GATES from harm; Plaintiff is suing in her individual and official capacity.

15.    Defendant WAGNER is and was at all times relevant a Captain at OSCI and the institution's PREA Compliance Manager. Defendant WAGNER is responsible for managing compliance with Prison Rape Elimination Act (PREA) requirements including providing counseling, protection and adequate investigation of PREA violations. Defendant WAGNER had

a duty to ensure the provision of adequate medical care to prisoners, and to reasonably protect prisoners facing a substantial risk of physical harm. Defendant WAGNER is among those responsible for failing to reasonably protect Ms. FOUST from harm; she is suing in him individual and official capacity.

16.    defendants JOHN and JANE Does 1-20, ODOC/OSCI/OSP was at all times relevant employed by the state of Oregon and worked for the ODOC and defendants JOHN and JANE Does 1-20 was tasked with overseeing and running the day-to-day operations of the dorm at OSP, and had a duty to ensure the provision of adequate safety to prisoners, and to reasonably protect prisoners facing a substantial risk of physical harm. Plaintiff is suing them in their individual and official capacity.

### Factual Allegations[1]

17.    plaintiff exhausted all of her administrative remedies in a proper timely manor.

18.    On September 23, 2020, CORRIGAN returned Plaintiff's CD 117 in case no. OSCI-2020-09-051, asserting that Plaintiff's grievance did not state a claim that was actually grievable. Plaintiff was beaten at OSP by this gang member who was placed in the cell with her. This gang member was assigned to a cell with Plaintiff with complete disregard for her safety resulting in the AIC committing a hate crime against Plaintiff for no other reason than she is transgender.

19.    On September 23, 2020, CORRIGAN returned Plaintiff's CD 117 in case no. OSCI-2020-09-052, explaining that the September 8, 2020 fire evacuation of OSCI to OSP was necessary under the circumstances.

20.    On September 25, 2020, Plaintiff prepared and submitted a CD 117 in case no.

_____

[1]    In regards to quoted materials from Plaintiff, some grammar and spelling corrected for the ease of the reader; some left in place.

OSP-2020-09-181, that provided in relevant part:

> . . . On . . . 9-10-20 I was taken from [a cell at OSP](during our emergency evacuation) and was put into a dorm. My PREA rights were violated. I was forced to shower and use the bathroom in front of male AICs. There were windows where staff and inmates could view me at the times I had to use the showers and bathroom. AICs would come to the windows to see me in the shower and could see me from there bunks and the TV room. I was sexually harassed, ridiculed, targeted, and even stalked by one AIC. In attempts to resolve these issues I spoke to staff and attempted to have another area where I could use the bathroom and shower. I also requested to put up curtains to at least stop AICs from viewing me from showers. All attempts to find a solution were denied. Staff made no attempts to stop AICs from viewing me. This may have been a state of emergency you took me from one danger to put me into another danger. You cannot justify this.

21    On October 10, 2020, Plaintiff prepared and submitted a CD 117 in case no. OSCI-2020-10-041, complaining that she was being denied access to the law library, and by extension access to the courts, when the ODOC refused to schedule her for time in the library.

22.    On October 27, 2020, TREVOR FERRES prepared and signed a declaration averring to the facts surrounding the treatment of Plaintiff and other transgender women while they were being held in a inhospitable space with approximately 145 other male inmates.

23.    TREVOR FERRES averred that "the bathroom faculties were not fit for any kind of privacy for anyone, bathroom stalls had open disclosure for anyone using them, this included the showers that were only fit for group bathing.

24.    TREVOR FERRES further averred that Plaintiff endured "direct and indirect verbal aggression . . . [while] requesting privacy while using the bathroom and showers . . . endangering their safety solely because of their gender identification.

25.    The bathroom in the dorm had 4-sinks, 4-toilets, 3-urinals, and 8-shower heads for 150-inmates.

26.    The sinks, toilets, and urinals were in a common area with no privacy what so

ever. The toilets were placed just 2-feet apart and completely open, the urinals were just 6-inches

apart with no dividers between them. The 8-shower heads also occupied a single common area

without any dividers between them. The windows were about 4-feet tall, starting from about 3-

feet from the floor. The windows had about 12-inches of frosting starting from the bottom sill,

leaving the top 3-feet clear.

27.    The following diagram fairly depicts the layout of the bathroom, although not

exactly to scale:



28.    There were at least two steps up to the officer's platform giving them a viewing

advantage into the bathroom, shower area, and living/bunk areas.

29.    At any given point in time during the day several inmates were using the

bathroom facilities. There was not any time whatsoever when Plaintiff was housed in the dorm at

OSP when she had even a moment of privacy to urinate, defecate, or shower.

30.    If Plaintiff sat on the toilet, she was clearly and totally visible to any person using

the sinks, using the toilets, using the urinals, coming and going from the showers, officers on

their dais, inmates in the TV room, or inmates walking between the officer's dais and the

bathroom, and from the top bunks in the living areas that had direct view of the bathroom/shower

area.

31.    If Plaintiff used the showers, she was clearly and totally visible to the officers on their dais, inmates in the TV room, inmates walking between the officer's dais and the bathroom or inmates entering and leaving the bathroom and from the top bunks.

32.    On October 31, 2020, ADAMSON prepared and submitted a CD 117b in case no. OSP-2020-09-181, informing Plaintiff that they were investigating her allegations of PREA and sexual harassment violations and would return to her when the investigation was completed.

33.    On November 24, 2020, JOVAN ROBELLO prepared and signed a declaration related to the events she personally witnessed surrounding the housing of Plaintiff in the dorm at OSP starting September 10, 2020.

34.    ROBELLO averred that she too was a transgender woman and that Plaintiff:

> was forced to shower in view of male AICs and male staff. She was forced to use exposed bathrooms that are not PREA compliant. [Plaintiff] was sexually harassed by male AICs and security refused to help. She was forced to sleep on the floor in an overcrowded dorm when she attempted to get security to accommodate her by offering solutions so she could have privacy and PREA compliance, she was refused and met with aggression from staff who then made a spectral of the transgender shower time and closed dayroom to cause animosity and aggression towards [Plaintiff].
> On December 6, 2020, BRANDY MORRISON prepared and signed a declaration related to events she personally witnessed surrounding the events of September 10, 2020 forward when Plaintiff was housed in the dorm at OSP. MORRISON averred, in relevant part:

> . . . once housed we were put into a dormitory that was full of men, made to be subjected to cat calls, sexual harassment & deviant acts by the men on the dorm. Also, we were made to have to use the restroom & shower while men were present, be sexually harassed & watched while using the facilities, in full view of the men. I * others are on hormone replacement therapy, & do therefore have feminine features & are women, have breasts & were made to basically be a peepshow or our other choice was to not shower at all or the bathroom which is our right & also needed as everyday human bodily function. Nothing was done to actually keep us out of view of AICs & the PREA standards & OARs were broken which in turn presented the possibility of rape & sexual harassment . . .

35.    On December 29, 2020, GINA MARIE prepared and signed a declaration as to her

observation of events that took place in the OSP dorm from September 10, 2020 onward.

MARIE averred:

> I watched with great anxiousness and embarrassment for [Plaintiff] as she
> was forced to shower, and use the bathrooms in full view of both male
> AICs and male staff, which I believe is a PREA violation; additionally,
> [Plaintiff] was continuously sexually harassed, made fun of, and
> propositioned, while security staff remained complicit at minim by default
> for not interceding and stopping the harassment as mandated by their very
> job title, let alone being mandated by other provisions set out in the
> Oregon Administrative Rules and Oregon Revised Statutes.

> [Plaintiff] was forced to sleep on the floor in the overcrowded dorm; and
> when she went to security to seek more appropriate accommodations,
> some semblance of female privacy and PREA compliant conditions even
> offering simple solutions, she was met with aggression from the security
> staff; who then made a huge deal of the transgender shower time (loudly)
> in the presence of all other AICs in the overcrowded dorm, and
> intentionally closed the dayroom to make it appears as if it was being
> closed due to [Plaintiff's] seemingly legitimate complaints . . . [which]
> placed [Plaintiff] in danger, forcing her to to endure further retribution and
> attacks, and could have caused either of them to be injured from attack,
> and the security staff responsible clearly knows this tactic was intentional,
> and put [Plaintiff] in further danger.

36.    On December 31, 2020, ERIC WATSON, signed a declaration explaining the

circumstances that Plaintiff endured while the ODOC housed her in the dorm at OSP from

September 10 through September 15, 2020, including being forced to use bathroom facilities

while men were using them, as well as being sexually harassed by other inmates all the while

Defendants stood by idly.

37.    On January 2, 2020, PHILIP NERPEL signed a declaration setting forth the same

facts as the declaration signed by ERIC WATSON.

38.    On January 2, 2020, MATTHEW BIGBOY signed a declaration setting forth the

same facts as the declaration signed by ERIC WATSON and PHILIP NERPEL.

39.    On January 23, 2020, DEMETRIUS L. VAUGHAN-FRANCE signed a

declaration setting forth the same facts as the declaration signed by ERIC WATSON, PHILIP NERPEL, and MATTHEW BIGBOY.

40.    On February 8, 2020, TREVOR FERRES signed a declaration setting forth the same facts as the declaration signed by ERIC WATSON, PHILIP NERPEL, DEMETRIUS L. VAUGHAN-FRANCE, and MATTHEW BIGBOY.

41.    On June 23, 2021, IAN WILLIAMS signed a declaration setting forth the same facts as the declaration signed by ERIC WATSON, PHILIP NERPEL, DEMETRIUS L. VAUGHAN-FRANCE, and MATTHEW BIGBOY.

42.    On June 18, 2021, SHAWNA DONALDSON prepared and signed a lengthy declaration setting forth all of the harassment that Plaintiff endured as witnessed by DONALDSON in the time that she has known Plaintiff.

43.    On February 23, 2021, the Department of Administrative Services (DAS), Risk Management notified Plaintiff that it had received her notice of claim, in Claim Number L170804 as it related to the events in the OSP dorm.

44.    On April 16, 2021, DAS, Risk Management informed Plaintiff, in Claim Number L170804, that based on "ODOC records" the "[a]llegations related to private bathroom and shower access are not violations of PREA." DAS further found that "shower use was voluntary and there was frosting on the bathroom windows to limit viewing from the officer's station."

45.    The findings from the ODOC and DAS are fully and completely erroneous and incorrect and further perpetuate the violations against Plaintiff. While it is true there was some frosting on the windows, the only possible way that one would be blocked from seeing into the bathroom or shower area is if a person was standing right next to the window and was less than 4-feet tall, or in a seated position next to the window. Any person who was taller than 4-feet tall could easily see everything in the bathroom or showers. Further, the only area not visible in the

bathroom or shower area from the officer's dais was directly against the wall to about 4-feet. In other words, the sinks, the toilets, the urinals, and the showers were completely visible from the officer's dais unless the officer were crouching down behind the dais desk or lying on the floor. If an officer were sitting in a chair or standing, as they always were, they could see all but approximately 5% of the bathroom and shower area, areas where inmates rarely stood because there were no fixtures or reasons to be in those areas. Plaintiff has recounted her full description of what took place when she was housed at OSP during the fire evacuation as fallows: transgender people face specific privacy and safety concerns when showering, using multi-user restrooms, changing clothing, and housing needs.

46.    During the evacuation due to the fires Defendants knowingly placed Plaintiff ''a transgender female'' in general population at OSP with the knowledge that Plaintiff has a keep separate order on an AIC JESSE MCCALISTER who is supposed to stab Plaintiff by order of his gang.

47.    Defendants knowingly put Plaintiff's life in danger. Had JESSE MCCALISTER seen Plaintiff he would have tried to kill the Plaintiff. Plaintiff lived in fear of losing her life while housed at OSP. Plaintiff is also a drop out gang member.

48.    Furthermore, while housed at SRCI in 2018 staff put Plaintiff into involuntary administrative segregation and removed her from SRCI in 2019 because they said a AIC from a gang that had placed a hit out on Plaintiff and her life and safety was in danger. This AIC was housed at OSP at the time of the fires just one tier above Plaintiff's and she was made to go to chow at the same time as this AIC thus putting the Plaintiff's life in further danger.

49.    On September 8, 2020 Plaintiff was placed on the OSP yard at approximately 6:00 PM while Defendants worked out housing for OSCI AICs. Plaintiff was exposed to the smoke from the wild fires for days. At points Plaintiff was breathing so much smoke that when she

exhaled it looked as if she were smoking.

50.    Plaintiff was made to use the toilets on the yard while she was made to stay outside waiting to be housed; none are PREA complaint and of such a filthy nature no self-respecting human being would go near that area. The odor alone was enough to turn your stomach.

51.    For several hours Plaintiff was forced to use these toilets exposed to male AICs and she was forced to stand to urinate like a man which caused Plaintiff mental emotional distress due to Plaintiff's gender dysphoria. Furthermore, Plaintiff was being stalked by 2-male AICs: TERENCE JACOB and another unknown person.

52.    There were approximately 844 AICs on the yard and approximately 7 staff members to monitor all of these AICS. This made it easy for AICs to conduct themselves in inappropriate ways that were and are criminal in nature.

53.    At approximately 3:30 AM Plaintiff was escorted into OSP and was assigned to Unit E, Cell 210. This unit at OSP is reserved for troublemakers at the prison. Being a vulnerable transgender woman Plaintiff was placed in this unit with blatant disregard for her safety, and the safety and security of the institution.

54.    On September 9, 2020 at approximately 2:00 pm an AIC was released from solitary confinement and was assigned to the bottom bunk in the cell Plaintiff was assigned to. Transgenders in the ODOC who are undergoing hormone replacement therapy are not housed with male AICs do to their vulnerable state, unless the transgender AIC requested to live with a male.

55.    Regardless of Plaintiff's past history she has been on hormones now for 4-years and the medications have weakened Plaintiff to the point of venerability. Plaintiff could not defend herself against a male if one were to assault her because of her weakened state.

56.     Yet they put a male AIC who is a gang member from Southside, 13ᵗʰ Street, in the cell with the Plaintiff. Due to being transgender, Plaintiff was assaulted. This inmate's gang has a policy to not cell up with LGBTQ AICs. He spoke to a AIC from his gang on the tier in Spanish he asked Plaintiff her name and Plaintiff told him Jessica he then repeated it to the person he was speaking to, he spoke to this person on the tier in Spanish (so Plaintiff does not know what was said) he then asked Plaintiff if she was a transgender, to which Plaintiff said yes, he then started assaulting Plaintiff with his fists, punching her multiple times in the head, face and body while she was curled up in the fetal position. Plaintiff wanted to scream for help, but feared that this would only cause her further harm, and in the future and Plaintiff would be labeled a snitch.

57.     Plaintiff was helpless to his assault and did not defend herself due to the fear of being punished by staff and she did not want to lose her clear conduct. Once he stopped he told Plaintiff she had to "kick out." (in prison terms this means she has to leave the cell by kicking the door until staff remove you and place you into DSU) Plaintiff reasoned with him and got him to wait until chow time which was being served late do to the overcrowding of the institution. Once Defendants ran chow time and let Plaintiff out of the cell, she went to a Lt. JANE DOE who happened to be speaking to her cellmate from OSCI, Ms. DONALDSON.

58.     Plaintiff spoke to Defendant DOE about what had transpired and asked them to move Plaintiff into a cell with Ms. DONALDSON. Staff did move Ms. DONALDSON into the cell with Plaintiff. PREA standards require agencies to conduct a case-by-case assessment based on multiple factors to determine the appropriate housing placement for each transgender prisoner. This was not the case when they housed the Plaintiff. Further ore ODOC is required to do a PREA assessment within 72 hours of a transgender entering into a new facility, to determine their venerability, and housing needs. Yet there was no PREA review process that took place at any time while housed at OSP. Rather than just housing the Plaintiff and Ms. DONALDSON

together in the first place as they did with other transgenders that were cellmates at OSCI, they put the Plaintiff in a 2-person cell alone which created these unsafe circumstances that lead to her being assaulted. This was clearly deliberate indifference that lead to physical, mental and emotional injuries. This has traumatized the Plaintiff and she has lived in fear of being assaulted further by men in the ODOC and has made clear at OSCI to PREA staff Defendant Lt. WALLACE her fear.

59.    On September 10, 2020 staff issued Plaintiff, and Ms. DONALDSON move slips informing Plaintiff she was moving to an all-male dorm. Plaintiff and Ms. DONALDSON attempted to tell JOHN DOE they did not feel safe and asked for JOHN DOE to leave them in the cell they were in, or to move Plaintiff and her cellmate to another cell. Defendant DOE told Plaintiff they would put her in disciplinary confinement and give Plaintiff misconduct reports if she did not shut up and do as she was told. In an attempt to find some kind of privacy and normalcy in the dorm Plaintiff put up curtains around the bunks so she had a place to change her clothing and feel safe, yet this did not prevent male AICs from viewing Plaintiff nude in her bunk area.

60.    On the night of September 10, 2020 an AIC attempted to climb into bed with Plaintiff and Ms. DONALDSON multiple times but kept getting caught by the officer who never checked to see if Plaintiff was okay. This AIC attempted to proposition Plaintiff and Ms. DONALDSON and was becoming hostile towards Plaintiff. When someone said the cop was coming he slunk back to his bed for the last time that night. This AIC attempted to come to Plaintiff's beds approximately 5-times that night, and Defendants never checked to see if the Plaintiff was okay or not, even though the AIC made it onto Plaintiff's bed twice and had time to harm Plaintiff and Ms. DONALDSON.

61.    Plaintiff was sexually harassed every day she was there at OSP, even in front of

Defendants, John and Jane Doe, including Defendant GARFIELD, yet Defendants did nothing to stop it, and even engaged in disrespectful slander towards Plaintiff and other transgender AICs that were in the dorm. These staff did this with male AICs that were housed in the dorm with Plaintiff. This empowered the AICs in the dorm to engage in hateful slanders towards us and to our faces. Staff who engaged in this behavior violated their code of conduct and created an environment that was full of hate and anger towards the plaintiff. Plaintiff had several conversations with Defendant GARFIELD about the events depicted herein to no avail.

62.     plaintiff is now being forced to live with male AIC's in retaliation for perusing this litigation, in violation of he rights to bodily privacy. Plaintiff has made numerous complaints and has filed timely grievances, and exhausted her administrative remedies. plaintiff has asked to be housed with other females such as herself but all staff at TRCI have refused her requests and force the plaintiff to live only with males in direct violation of her rights.

63.     ODOC has stated they have a zero-tolerance policy for sexual harassment, yet staff did nothing to stop the sexual harassment from taking place, even to date. The dorm Plaintiff was assigned to was overcrowded, and full of smoke creating an inability for social distancing and an increased risk for the spread of COVID 19. This all took place at the height of the COVID 19 pandemic. The dorm was full of smoke from the wild fires and everyone was coughing.

64.     This made many of us fearful of becoming sick with the COVID virus. Staff was not enforcing the federal mask mandate, and due to the smoke, the masks made it nearly impossible to breath forcing most of us to not wear our masks. OSP did not have ventilation that kept the smoke out of the dorm creating a super spread of the virus that ran ramped threw OSCI after our return. Many AICs were not reporting they were sick at this time because if you did, they would put you in disciplinary segregation.

65.     Plaintiff contracted COVID 19 from OSP but was in fear to report it because she was scared of being shipped to another prison after quarantine, so Plaintiff self-isolated as did her cellmate. Plaintiff's lungs do not function as they once did do to this virus and at times it is hard to breath even a year later after the infection.

66.     While housed at OSP there was COVID 19 going through the prison, due to the smoke inhalation people were coughing and people were not made to wear their masks, AICs working in the kitchen serving food were not made to wear face coverings, there were even staff not wearing masks.

67.     In an attempt to try and keep from getting sick, and due to Plaintiff's transgender status she asked to shower in a private shower, but she was denied by Defendants, who told Plaintiff she had to use the dorms showers.

68.     ODOC policy states that inmates shall maintain proper hygiene standards. Inmates who fail to maintain proper hygiene standards may be directed by staff to correct deficiencies in order to maintain a minimally acceptable level of personal hygiene ''and to protect the health and safety of the inmate, other inmates, and staff.''

69.     defendants showed their prejudice when they provided showers to all male AIC's, but told the plaintiff they would not accommodate her to shower in a private setting in violation of her bodily privacy.

70.     PREA standards state that regardless of where transgenders and intersex individuals are housed, any policy or practice that forces transgender or intersex individuals to shower in group shower settings violates PREA.

71.     PREA further mandates that facilities implement policies to ensure that individuals are able to shower and undress without being viewed by staff of the opposite gender and that agencies are required to provide transgenders and intersex individuals with access to

private showers in "ALL" circumstances.

72.    Plaintiff asked Defendant ROSS and Defendant HYDE if she could put curtains over the windows to provide Plaintiff privacy so that male staff and AICs could not view Plaintiff naked but she was told no, and was met with aggression by both Defendant HYDE and Defendant ROSS and told she had nothing coming. Plaintiff could not shower in private but instead she was forced to shower in plain view of male staff from the officer's station and AICs who were coming to the shower windows and looking in at Plaintiff, and they were able to view Plaintiff from the TV room.

73.    There is a frost on the widows that covers" the bottoms of the windows" but it only covers approximately 1-foot in height of the bottom of the window. This was not enough to prevent staff from seeing Plaintiff's naked body while they sat on there raised plat form that looked directly into the showers and it was not enough to stop the AICs who walked up to the windows and looked in at Plaintiff from viewing her body. AICs were able to see Plaintiff from there top bunks while she showered as well. Furthermore, defendants refused to reprimand or punish the AIC's that came to the shower windows to view the plaintiff nude.

74.    Plaintiff asked Defendant GARFIELD and DOE Defendants to let her use the showers in segregation or somewhere else that was private but she was met with aggression by Defendants as well and was refused proper accommodations by Defendants.

75.    Making matters worse Defendants started closing down the dayroom and directing all AICs to sit on their bunks in order to let transgender AICs shower. This created a hostile environment for Plaintiff and other transgenders. They were punishing the male population by taking away their dayroom privileges in the dorm because Plaintiff wanted to shower as everyone else.

76.    Defendants denied Plaintiff gender confirming and needed clean undergarments

such as bras and panties but rather made her live in her dirty clothing for 7-days while housed at OSP.

77.     Defendants' acts and omissions created a threat to the safety and security of the institution and put Plaintiff in danger of being assaulted by the AICs who were being directed to remain on their bunks and taking their dayroom privileges while Plaintiff and other transgender women showered. Several times Plaintiff was threatened by AICs with bodily harm if she did not stop showering. In an attempt to compromise Plaintiff started to shower as late as 2:00 am so that she would not be hurt.

78.     Defendant GARFIELD and other Defendant John and Jane DOES stood by and did nothing when Plaintiff reported this and went so far as to say that anyone who fights gets a free pass and won't be punished, staff created a hostile environment for Plaintiff and she lived in fear hiding behind a mask of bravado, that was fake. While in this dorm men sexually touched Plaintiff, grabbed Plaintiff's butt, touched Plaintiff's breasts, and made sexual advances towards Plaintiff usually in the stairwell where there is no cameras and no guard. This would take place when going to and from the dorm, such as on the way to med line, or chow time.

79.     No one knew when we would be going back to OSCI and rumors of us being there at OSP for a month or more were around thus instilling a feeling of the need to settle in. and an underlying fear that this was to be Plaintiff's humiliation to shower and use the bathroom in plain view of male AICS, and male staff and be sexually abused and harassed for as long as she was to be there. Defendants blatantly and purposefully put Plaintiff's life in danger and forced her to expose her body to approximately 150 men. Defendants put Plaintiff's life in danger by forcing her to live in an all-male dorm that affords no bodily privacy for transgender women.

80.     Plaintiff was forced to use the toilets in the dorm that had no privacy; Plaintiff was forced to expose herself in a most humiliating way. no woman wants to be seen or heard using

the toilet by a completely strange man.

81.     Plaintiff was ridiculed and teased and made fun of. Men were getting their friends to come view Plaintiff as she used the toilet; they made sexual comments and sexually harassed Plaintiff making fun of her

and staff stood by and did nothing.

82.     Plaintiff and other transgenders attempted to get Defendants to let them use the private bathroom that staff used but again Plaintiff was met with aggression. Plaintiff was forced to wear the same female undergarments for a week because Defendant GARFIELD and other Defendant DOES refused to provide Plaintiff with clean bras and panties. The men were given clean men's underwear clean pants and shirts; all of their needs were met but Defendants refused to accommodate the females in any way shape or form.

83.     Plaintiff was forced to endure this torture in the dorm for 5-days. Plaintiff was propositioned for sex at least 20-times.

84.     Plaintiff was not given her medication for several days that prevents her liver from producing gallstones or her gender confirming hormones that caused Plaintiff to have extreme mood swings, depression and she was also not afforded her anxiety medication this caused Plaintiff to have multiple several anxiety attacks that made Plaintiff feel like she was going to die.

85.     Plaintiff was stalked by one AIC in the dorm and Defendants did nothing to stop this. Plaintiff reported the harassment to Defendants john doe x2 and her claims were ignored with blatant disregard and later were unsubstantiated when investigators viewed the dorm cameras and told the plaintiff that the cameras were of such pore quality they could not make anything out.

86.     defendants had knowledge that these cameras were not functional do to lack of

quality of the cameras, defendants still chose to house the plaintiff in the dorm where there was no way to insure her safety.

87.    defendants showed they did not need to evacuate OSCI because they in fact allowed AIC's to remain at OSCI during the fire evacuation do to the risk to their life's if they were to be housed at OSP.

88.    this shows the defendants had the ability to keep the plaintiff safely housed at OSCI rather than putting her life in danger by moving her to OSP and housing her in general population where she would have been stabbed or killed had Jesse McCallister seen the plaintiff.

89.    The failure to schedule Plaintiff for PREA screening and/or mental health services exhibited deliberate indifference to her severe medical and safety needs and a failure to fallow protocol.

90.    On September 15, 2020, Plaintiff prepared and filed a CD 117 in case no. OSCI-2020-09-062, complaining that the ODOC unreasonably, and with deliberate indifference, exposed her to COVID-19 when she was transported to OSP on September 5, 2020.

91.    Upon Plaintiffs return to OSCI she realized she had contracted COVID 19. Plaintiff hid her symptoms and self-isolated to her cell out of fear she would be taken to DSU for quarantine and then be moved to another prison.

plaintiff suffers long term covid symptoms, such as chronic coughing, breathing issues, problems with memory, dizzy spells migraines and tinnitus that the defendants refuse to treat the plaintiff for her post covid symptoms.

92.    Each one of the Defendants, at some point in time had an opportunity to rectify the deliberate indifference to Plaintiff's personal safety and severe medical needs, instead jointly and severally willfully chose to act with deliberate indifference.

93. Defendants jointly and severally denied Plaintiff her serious safety needs resulting in the unnecessary and wanton infliction of pain.

94. Defendants jointly and severally gave no medical or safety reason for denying Plaintiff her serious medical and safety needs.

95. Defendants jointly and severally were unreasonably relying on their own non-specialized conclusions with deliberate indifference to Plaintiff's safety and health needs.

96. Defendants jointly and severally chose a course of treatment and cell placement for Plaintiff was unacceptable under the circumstances and Defendants chose this course in conscious disregard of the excessive risk of Plaintiff's health and safety.

97. Based on the records and inferences drawn from them, Defendants' decisions repeated denials of Plaintiff's safety and medical needs was unacceptable under all circumstances.

98. Defendant's current course of treatment for Plaintiff has not alleviated her severe ongoing issues.

99. Each Defendant were sufficiently aware, or should have been sufficiently aware of Plaintiff's serious needs.

100. Each Defendant deprived Plaintiff of the care that was objectively needed and was the minimal civilized measure of life's necessities.

101. Defendants jointly and severally have retaliated against Plaintiff in denying her constitutionally adequate safety and medical care as a direct and proximate result of Plaintiff redressing her grievances in the courts.

102 As a result of the violations of the law and the Constitution, Plaintiff has suffered significant physical assaults, pain, suffering, psychological damage, has ongoing PTSD symptoms, suffers present serious emotional harm and loss, has difficulty with coping and

sleeping, and suffers from a loss of personal security all to her economic and non-economic damages to be determined by a jury.

103.   Plaintiff sent a Notice of Tort Claim in a timely fashion under Oregon Revised Statutes Chapter 30.

## FIRST CLAIM FOR RELIEF
## 1st, 8th & 14th Amendment Violations
## (All DEFENDANTS)

104.   Plaintiff re-alleges all allegations set forth in paragraphs 1-103,

105.   At all times relevant, DEFENDANTS were or should have been aware that Plaintiff was in danger at all times while she was housed at OSP.

106.   Plaintiff, as a prisoner confined to a correctional facility, is entitled to be provided the essential aspects of a safe, sanitary and humane confinement including protection from harms and threats to her safety and security under the Eighth Amendment to the United States Constitution.

107.   Plaintiff is entitled to the full protection of the laws including the Prison Litigation Reform Act and the Prison Rape Elimination Act which requires ODOC and defendants to comply with the laws in providing protection from assault, sexual abuse and sexual harassment, providing protection to vulnerable inmates and to comply with all aspects of intervening and providing a safe environment to Plaintiff.

108.   All DEFENDANTS had a duty to take reasonable steps to protect the plaintiff, from physical and sexual abuse. DEFENDANTS' actions as described herein subjected Plaintiff to assault violating her Eighth Amendment rights. DEFENDANTS' insistence to ignore the keep separate order, that the plaintiff has in lace for her safety and forced the Plaintiff be housed at OSP with an AIC that is supposed to kill the plaintiff, violates her constitutional rights under the 14th and 8th amendments. DEFENDANTS' refusal to reassign Plaintiff shows deliberate

indifference to a serious threat to Plaintiff's safety. The Supreme Court has held that placing a preoperative transsexual, who acts and dresses effeminately, in the prison's general population evinced deliberate indifference to an inmate's safety. *See Farmer v. Brennan*, 511 US 825 (1994).

109. Defendants violated the Constitutional and statutory rights held by Plaintiff in the following ways:

(a)     Failed to provide adequate screening and risk evaluation of Plaintiff upon her entry into OSP;

(b)     Failed to properly house Plaintiff to avoid contact with an aggressive inmate;

(c)     Failed to properly protect Plaintiff from sexually aggressive inmates;

(d)     failed to consider that the plaintiff has been deemed a vulnerable person within and by the ODOC.

(e)     defendants did and continue to force the plaintiff who is a female to be housed in a cell with a male.

(f)     defendants knew there were active covid cases at OSP and chose to expose the plaintiff to this deadly virus resulting in the plaintiff contracting the virus and suffering long term covid.

110. As a result of the failures by Defendants herein, Plaintiff was placed in a cell and in the dorm at OSP with well-documented and known violent male offenders. The housing decision resulted in Plaintiff being sexually harassed, and sexually abused numerous times, and violates her right to bodily privacy.

111. As a result of the decision not to screen Plaintiff, and to force her to cell in with and be housed in a dorm with violent offenders, in violation of ODOC policy that vulnerable persons are not to be housed with aggressive or aggressive potential persons resulted in Plaintiff being sexually abused, physically assaulted, sexually harassed and suffered significant emotional damage and physical harm all to her detriment of economic and non-economic damages to be

determined by a jury.

## SECOND CLAIM FOR RELIF
### (CIVIL RIGHTS 42 USC § 1983 (SUPERVISOR LIABILITY) against HIGHBERGER, COLETTE PETERS, JOSHUA WAGNER, BRIAN KELLY

112.        Plaintiff re-alleges paragraphs 1-111, supra, as if fully set forth herein.

213.  plaintiff exhausted her administrative remedies and gave a timely notice of tort.

214.  Defendant state of Oregon was the employer of COLETTE PETERS, Director,

Oregon Department of Corrections (ODOC);

GARRETT LANEY, Superintendent, Oregon State Correctional Institution (OSCI);

JON HYDE; Captain, OSCI; G. ROSS, Captain OSCI; JOSHUA WAGNER, Captain & PREA

Compliance Manager, OSCI; BRIAN KELLY, Oregon State Penitentiary (OSP) Superintendent;

(FNU) GARFIELD, OSCI; Correctional Officer (C/O); JOHN and JANE Doe's

1-20, and thus state of Oregon's agents and employees had a duty to exercise reasonable

care to investigate the complaints made against these defendants, and to prevent them from doing

harm to prisoners such as the plaintiff.

  (a) Defendants had a responsibility in final decision making when it came to the evacuation

  (b)  Defendants failed to up keep the institution and provide humane conditions, such as proper ventilation, allowed for overcrowding, failed to provide clean clothing, and humane conditions to shower and use the bathroom.

  (c) defendants knew or should have known that placing Ms. Foust at OSP in general population, while also housing AIC Jesse McCallister in general population with her put her life in danger do to her keep away order that is in place.

(d)    defendants knew there were active covid cases at OSP and chose to expose the plaintiff to this deadly virus resulting in the plaintiff contracting the virus and suffering long term covid.

115.    defendants knew or should have known that Ms. Foust had an active keep separate order in place on AIC Jesse McCallister and all defendants chose to ignore this to place Ms. Foust at OSP.

116.    defendant Wagner knew or should have known that his decision to ignore PREA and prison policy in not housing the plaintiff A vulnerable female, with aggressive male AIC's would result in the plaintiff being harmed but did so anyways.

117.    Defendants Highberger, Kelly, Wagner and Colette Peters failure to manage the prison staff led to the multiple violations of Ms. Foust's constitutional rights. As a result, Ms. Foust was denied safe housing, and suffered mental and emotional damages as well as physical damages when she was physically assaulted, sexually harassed, and sexually abused. Accordingly, plaintiff is entitled to compensatory and punitive damages against defendants HIGHBERGER, KELLY, WAGNER and COLETTE PETERS in an amount to be determined at trial for the violations of 42 USC § 1983 as well as economic damages.

## THIRD CLAIM FOR RELIEF

### (NEGLIGENCE – AGAINST DEFENDANT STATE OF OREGON)

118.    plaintiff realleges paragraphs 1-117.

119.    plaintiff exhausted her administrative remedies and gave a timely notice of tort.

120.    Defendant state of Oregon was the employer of all defendants listed here in this case

121.    and thus, state of Oregon's agents and employees had a duty to exercise reasonable care

to investigate the complaints made against the defendants in this case and to prevent them from doing harm to prisoners such as the plaintiff.

122.    state of Oregon's employees and agents. Including but not limited to Ross, Hyde, Garfield, Colette Peters, Highberger, investigators, captains, Lieutenants, officers, all workers were acting within their scope and course of their agency or employment.

123.    state of Oregon's employees and agents were negligent in one or more of the fallowing particulars:

   a.  in tolerating an atmosphere of unprofessionalism, vulgar language, and abuse towards the AIC population.

   b.  in failing to properly investigate the complaints of harassment and abuse made against all defendants and AIC's.

   c.  in failing to monitor or otherwise maintain a professional work place and living environment;

   d.  in failing to protect the plaintiff from harm.

   e.  All defendants were responsible for ordering plaintiff to be moved to OSP;

   f.  And all had a final say in all proceedings that took place herein.

124.    the state of Oregon breached its duty in that its agents and employees knew or should have known that moving drop out gang members to a facility where they house active gang members would cause harm to others, including the plaintiff, who is also a drop out gang member.

125.    in the alternative, the state of Oregon's agents and employees knew or in the exercise of reasonable care should have known their acts and omissions as set forth herein would result in a foreseeable risk of injury to others, including the plaintiff.

126.    as a direct result of the state of Oregon's employees, actors, and agents' negligence, plaintiff suffered physical injury, distress, anxiety, fear that she was going to die, and potential lifelong physical damages to her overall health do to exposing the plaintiff to covid.

127.    as a direct and proximate result of defendant's negligence, plaintiff will incur future economic damages for medical bills for treatment of her sever anxiety, and any other medical issues that might arise from the injuries that were incurred do to the negligence herein.

128.    Defendant state of Oregon is liable to plaintiff for economic and noneconomic damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Article I, § 16, Or Const Violation
### Deliberate Indifference
### (All DEFENDANTS)

129.    Plaintiff re-alleges all allegations set forth in paragraphs 1-159, *supra*, as if fully set forth herein.

130.    At all times relevant, DEFENDANTS were aware that Plaintiff has gender dysphoria, a serious medical need that compromises an individual's physical health and mental well-being and safety;

131.    The acts and omissions of all DEFENDANTS, jointly and severally, constitute deliberate indifference to Plaintiff's serious needs in violation of Article I, § 16, of the Oregon Constitution, by denying the plaintiff safety for the entire time that Plaintiff was housed at OSP in one or more of the following particulars:

(a)    DEFENDANTS improperly failed to take into consideration Plaintiff's gender dysphoria when they transported Plaintiff to OSP and housed her during the times alleged herein with male AIC's;

(b)    DEFENDANTS improperly failed to take into consideration Plaintiff's keep away

order that was put in place to protect her life as Plaintiff alleged herein;

(c)     DEFENDANTS improperly denied Plaintiff proper clothing, and bodily privacy to use the bathroom and showers for the entire time described herein;

(d)     DEFENDANTS failed to follow all relevant state and federal policy, regulations, and laws, including but not limited to USC Title 34, Subtitle III, Chapter 303, §30301; USC Title 34, Subtitle III, Chapter 303, §30302 in dealing with PREA allegations.

132.    As a result of the failures by DEFENDANTS, Plaintiff has suffered a assault, sexual assault, sexual harassment, serious physical harm, serious long-term psychological damage, and further stigma and harm as a result of the failures by defendants, all to his significant economic and non-economic losses to be determined by a jury.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for a judgment against Defendants as follows:

a.  For judgement in favor of the plaintiff against defendants for compensatory, punitive, economical and noneconomical damages;

b.  For such other and further relief as may appear just and appropriate.

Pursuant to 28 U.S.C. § 1746(2), I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

That the foregoing is true and correct.

DATED this 15 day of March, 2023.

Respectfully submitted, _____

Jessica Faust #17179507
82911 beach access Rd.
Umatilla OR 97882
Plaintiff, *pro se*

## CERTIFICATE OF SERVICE

**CASE NAME:** _FOUST_ v. _BROWN_

**CASE NUMBER:** (if known) _6:21-CV-01440-MK_

COMES NOW, _JESSICA FOUST_, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at <u>Two Rivers Correctional Institution (TRCI)</u>.

That on the _15_ day of _MARCH_, 20_23_, I personally gave Two Rivers Correctional Institution's e-filing service A TRUE COPY of the following:

_MOTION TO AMEND COMPLAINT_

_AMENDED COMPLAINT_

_____
(Signature)

Print Name _JESSICA FOUST_

S.I.D. No.: _17179507_

Page 1 of 1 –Certificate of Service